AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 22-sw-189 |
| A BLACK TCL CELLULAR TELEPHONE WITH A CRACKED SCREEN BEARING PCN #1072058 CURRENTLY LOCATED AT THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, WASHINGTON DIVISION, IN WASHINGTON, D.C., UNDER RULE 41 | ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | - Unlawful Possession of Firearm by a Convicted Person |
| 18 U.S.C. § 924(c)(1)(A) | - Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense |
| 21 U.S.C. § 841(a)(1) | - Unlawful Possession with Intent Distribute a Mixture and Substance Containing a Detectable Amount of Heroin, Amphetamines, and/or Phencyclidine |

The application is based on these facts:

See Affidavit in Support of Application

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Thomas Webb, Detective, MPD
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ Telephone _____ *(specify reliable electronic means).*

Date: _____ 06/16/2022 _____

_____
*Judge's signature*

City and state: Washington, D.C.

ROBIN M. MERIWEATHER, U.S. Magistrate Judge
_____
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means    ☑ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  22-sw-189 |
| A BLACK TCL CELLULAR TELEPHONE WITH A CRACKED SCREEN | ) | |
| BEARING PCN #11072058 CURRENTLY LOCATED AT THE BUREAU OF | ) | |
| ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, WASHINGTON | ) | |
| DIVISION, IN WASHINGTON, D.C., UNDER RULE 41 | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ Columbia

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference)

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

**YOU ARE COMMANDED** to execute this warrant on or before _____ June 29, 2022 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.    ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ ROBIN M. MERIWEATHER _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   06/16/2022 _____

_____

*Judge's signature*

City and state:   Washington, D.C. _____          ROBIN M. MERIWEATHER, U.S. Magistrate Judge

*Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  22-sw-189 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### *Property to be searched*

TCL cellular phone, black in color, with a cracked screen bearing Metropolitan Police Property number (PCN) 11072058 which was seized by Metropolitan Police Department (MPD) officers incident to the arrest of James Fitzgerald HONESTY on May 23, 2022 (the "Device"), and subsequently transferred to and currently in the custody of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Washington Division located at 90 K Street, NE, Washington, D.C.

## ATTACHMENT B

### *Property to be seized*

1.      The items, information, and data to be seized are fruits, evidence, information relating to, contraband, or instrumentalities, in whatever form and however stored, relating to firearm and drug possession offenses in violation of Title 18 U.S.C. § 922(g)(1) (Unlawful Possession of Firearm by a Convicted Person), 18 U.S.C. § 924(c)(1)(A) (Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense), and 21 U.S.C. § 841(a)(1) (Unlawful Possession with Intent Distribute a Mixture and Substance Containing a Detectable Amount of Heroin, Amphetamines, and/or Phencyclidine) as described in the search warrant affidavit (collectively, the "TARGET OFFENSES") including, but not limited to: evidence, such as call logs, phone books, photographs, voice mail messages, text messages, images and video, Global Positioning System data, and any other stored electronic data:

   a.   establishing or documenting HONESTY'S involvement in the commission of the TARGET OFFENSES;

   b.   identifying locations where the individual committed the TARGET OFFENSES, traveled to before and after the commission of the TARGET OFFENSES, and in preparation for the TARGET OFFENSES;

   c.   reflecting the ownership and use of the items identified in Attachment A by the individual committing the TARGET OFFENSES;

1

d.   documenting meetings and communications between individuals committing one or more of the TARGET OFFENSES;

e.   reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals, discussing the commission of one more of the TARGET OFFENSES;

f.   reflecting communications between the individual committing one or more of the TARGET OFFENSES and other individuals who may have assisted or provided support in the commission of one or more of the TARGET OFFENSES;

g.   containing information that would constitute evidence of the TARGET OFFENSES (including photographs or videos that would constitute evidence of a violation of the TARGET OFFENSES);

h.   establishing information related to HONESTY'S use of social media that may reveal further evidence of the TARGET OFFENSES;

i.   records and information relating to a conspiracy to commit the TARGET OFFENSES, including HONESTY'S communications with potential co-conspirators regarding the TARGET OFFENSES;

j.   records and information relating to the identity or location of perpetrators, aiders and abettors, coconspirators, and accessories after the fact;

k.   evidence reflecting HONESTY'S connections to other individuals who have been observed frequenting the locations described in this affidavit;

2

l.  evidence reflecting the ownership and use of the items identified in Attachment A by the individual committing the TARGET OFFENSES;

m.  records and information that constitute evidence of the state of mind of HONESTY'S e.g., intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation;

n.  records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the TARGET OFFENSES; or (ii) communicated with HONESTY'S about matters relating to the TARGET OFFENSES, including records that help reveal their whereabouts;

o.  records and information documenting or containing evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of firearms, which would constitute evidence of one of the TARGET OFFENSES;

p.  records and information documenting or containing evidence of the purchase of items from the assets derived from the commission of a firearms trafficking offense, which would constitute evidence of one of the TARGET OFFENSES.

q.  records and information constituting evidence of who used, owned, or controlled the "Device";

3

r.  records and information constituting evidence of the times the Device were used; and

s.  records and information about passwords, encryption keys, and other access devices that may be necessary to access Device.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLACK TCL CELLULAR TELEPHONE WITH A CRACKED SCREEN BEARING PCN #11072058 CURRENTLY LOCATED AT THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES, WASHINGTON DIVISION, IN WASHINGTON, D.C., UNDER RULE 41 | SW No. 22-sw-189 |

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT AND ORDER

I, Thomas R. Webb, a Detective with the Metropolitan Police Department, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of certain property within the possession of law enforcement, that is, the cellular telephone described in Attachment A, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a sworn law enforcement officer employed by the Metropolitan Police Department (MPD) in the District of Columbia, and have been so employed for the past 32 years. I am also a sworn ATF Task Force Officer meaning that I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.

3.      I am currently assigned to MPD's Narcotics and Special Investigations Division in

the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Washington Field Division's

NIBIN Investigations Unit ("NIU")[1], a joint task force comprised of ATF Special Agents and MPD

Detectives.  I have been assigned to, among other things, investigate individuals who are involved

in the illegal purchase, possession, and transfer of firearms, and violent crimes involving firearms.

I have received formal training in criminal, death, gang, financial, homicide, firearms trafficking,

and narcotics investigations.

4.      In the course of my training and experience, I have become familiar with the

methods and techniques associated with the distribution and trafficking of firearms.  In the course

of conducting these investigations, I have been involved in the use of the following investigative

techniques: interviewing and handling informants and cooperating sources; conducting physical

surveillance; consensual monitoring and recording both telephonic and non-telephonic

communication; analyzing telephone pen registers, caller identification data, social media

accounts; monitoring court-authorized electronic surveillance including the use of cellular phone

technology, cellular towers, and the analysis of historical cellular phone records for the purpose of

determining the approximate location from which a phone was use at the particular time or range

of times.  During the course of my career with MPD, I have participated in over 800 arrests and

have also applied for and/or executed over 800 search warrants that led to the recovery of illegal

narcotics, weapons, U.S. currency, and other evidence relating to violent and financial crimes.

---

[1] The National Integrated Ballistic Information Network (NIBIN) Program is national network for law enforcement operated by ATF that allows for the capture and comparison of ballistic evidence to aid in solving and preventing violent crimes involving firearms.  *See*  https://www.atf.gov/resource-center/fact-sheet/fact-sheet-national-integrated-ballistic-information-network. [Last Accessed: June 7, 2022.]

5.      Since this affidavit is being submitted for the limited purpose of obtaining a search warrant for the electronic device, I have not set forth every fact learned during the course of this investigation.  I make this affidavit based, in part, on my personal knowledge and observations derived from my participation in this investigation, information provided by other law enforcement officers, reports and data provided by other officers, which I have read and reviewed, and, in part, upon information and belief.

6.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 U.S.C. § 922(g)(1) (Unlawful Possession of a Firearm by a Convicted Person), 18 U.S.C. § 924(c)(1)(A) (Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense), and 21 U.S.C. § 841(a)(1) (Unlawful Possession with Intent Distribute a Mixture and Substance Containing a Detectable Amount of Heroin, Amphetamines, and/or Phencyclidine) (collectively, the "TARGET OFFENSES") have been committed by James HONESTY (hereinafter "HONESTY"). There is also probable cause to search the Device, further described below and in Attachment A, for the things described in Attachment B.

## **JURISDICTION**

7.      This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

7

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

8.      The property to be searched consists of one (1) TCL cellular phone (hereinafter "Device"), black in color, with a cracked screen bearing Metropolitan Police Property number (PCN) 11072058 which was seized by MPD and logged in MPD's Seventh District property records in Washington, D.C., but was subsequently transferred to the custody of the ATF's Washington Division in Washington, D.C.   The Device was seized incident to the arrest of HONESTY on May 23, 2022, for Carrying a Pistol without a License, Possession of an Unregistered Firearm, Possession of Unregistered Ammunition, Unlawful Possession of Liquid PCP, Possession with Intent to Distribute a Controlled Substance, and Fugitive from Justice.

9.      On May 26, 2022, James HONESTY was charged and indicted in the United States District Court for the District of Columbia with Unlawful Possession of a Firearm and Ammunition by a Person Convicted of a Crime Punishable by Imprisonment for a Term Exceeding One Year, in violation of 18 U.S.C. § 922(g)(1); Unlawful Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Heroin, and Amphetamines, a Schedule I Narcotic Drug Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C); Unlawful Possession with Intent to Distribute a Mixture and Substance Containing a Detectable Amount of Phencyclidine, a Schedule II Narcotic Drug Controlled Substances, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C); and Using, Carrying and Possessing a Firearm During a Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c)(1)(A), in Case No. 22-cr-187 (TNM).

## PROBABLE CAUSE

10.      On May 23, 2022, at approximately 6:25 p.m., Metropolitan Police Department Officers Marcus Harmon and Matthew Zumbrun were patrolling the 2500 block of Anger Place,

SE in Washington, D.C. when they received a lookout in the same area for a black male with a slim build and dreadlocks wearing a white t-shirt with blue jeans who reportedly brandished a gun to the 9-1-1 caller's significant other.

11.     As Officers Harmon and Zumbrun were patrolling, they observed a male matching the lookout description (later identified as James HONESTY) walking in their vicinity.  After Officer Harmon exited the patrol vehicle, he and Officer Zumbrun attempted to make contact by approaching HONESTY on foot from behind.  When Officer Harmon called out to ask a question, HONESTY turned back, looked at the officers, and took flight.

12.     During the chase, Officer Harmon observed HONESTY reach for his waistband near the black crossbody satchel bag he was wearing on his midsection and ultimately produce a firearm in his right hand.  HONESTY dropped the firearm on the ground as he turned the corner in front of officers.  As Officers Harmon and Zumbrun remained with the gun, Officers Khanh Nguyen and Shane MacNamara continued to chase HONESTY and observed him drop the black satchel bag on the ground shortly before catching up to him.  Shortly after officers placed HONESTY under arrest, a woman approached and told officers that HONESTY was her son and was just protecting her.

13.     The firearm HONESTY dropped was later identified as a Springfield Armory XPM-9 9mm semi-automatic handgun with serial number of "HM903633".  At the time it was recovered, the firearm was loaded with twenty-one (21) rounds in an extended magazine and one (1) round in the chamber.  The black satchel bag contained three (3) vials of phencyclidine (PCP) containing flakes of tobacco leaves, thirty-two (32) grams of a white powdered substance (which field-tested inconclusive), fifty-eight (58) grams of a brown rock like substance that tested positive

for opiates and amphetamines, a scale, a small spoon with white powder residue on it, a large quantity of small Ziploc bags, and cash.  Based on the quantity of drugs and the packaging, the drugs seized from the HONESTY's satchel were more consistent with distribution than with personal use.

14.     A criminal history check of HONESTY revealed that he has prior criminal felony convictions in the Superior Court for the District of Columbia, including Case No. 2009 CF1 25972 and in United States District Court for the District of Maryland, for Carjacking and Possession of an Unregistered Firearm, docket number GLR-8-12-CR-00485-001, wherein he was sentenced to more than 12 months of incarceration.  Therefore, HONESTY was aware at the time of his arrest in this case that he had a prior conviction for a crime punishable by more than one year and was not authorized or licensed to possess a firearm or ammunition.  Further, there are no firearm or ammunition manufacturers in the District of Columbia, thus the firearm and ammunition in this case traveled in interstate commerce.

15.     In addition to the firearm, ammunition, drugs, and other paraphernalia recovered, MPD officers recovered the Device on HONESTY's person during the search incident to his arrest, logged it in MPD's Seventh District property records in Washington, D.C., and it was subsequently transferred to the custody of the ATF's Washington Division in Washington, D.C.  Based on my training and experience, I know that cellular telephones are frequently used by persons who are engaged in the illegal possession, transfer and distribution of firearms, ammunition, and drugs as a means to communicate with suppliers, customers, and others associated with the illegal purchase, sale, transfer, possession and use of firearms and drugs.  Those communications often include

phone calls, voicemails, written and audio text messages, as well as photos, images, and video, for example, of firearms or ammunition or themselves.

16.     Your affiant submits that this affidavit supports probable cause for a search warrant authorizing the examination of the Device, and extraction of video or videos that HONESTY recorded, prior to his arrest, of the illegal possession of firearms, ammunition, and drugs any electronically stored information, namely call logs, photographs, videos, saved usernames and passwords, documents, browsing history which would prove possession of illegal firearms and those who may have illegally sold or transferred the firearms and drugs to HONESTY.  HONESTY is a convicted felon who is prohibited to purchase firearms and ammunition which would lead one to believe that a secondary person or persons illegally purchased the firearms/ammunition and provided to or sold the firearms/ammunition which HONESTY was found to be in possession of.

17.     Based on my training and experience, I know that people who commit crime in Washington, D.C., often use their cell phones in ways that reveal their location and/or activities before, after, or while engaging in criminal activity.  For example, this may include location information (e.g., GPS data), app usage information (e.g., Internet search inquiries), and images or video recordings relevant to the criminal activity.  Furthermore, I know from training and experience that call logs, text messages, emails, and any app enabling communication with others frequently include communications that shed light on the cell phone user's location and activity during a particular time period.

18.     Based on my training and experience, I know that people who possess guns, illegal drugs, unlawfully obtained money, and other contraband in Washington, D.C., often use their cell phones to capture and store images or video recordings of such contraband – sometimes called

11

"trophy photos."  They also frequently share these images or video recordings with associates using email, text messaging, or other forms of communication on their cell phone such as online social networking services.  Similarly, they often refer to their guns, illegal drugs, and other contraband in text messages, emails, or other written communications that are carried out by and stored on their cell phone.  These communications, images, and video recordings can be evidence of a perpetrator's prior possession of a weapon or contraband, and of his knowledge and intent relating to such possession.

19.    Based on my training and experience, I know that crimes carried out by more than one person usually involve some amount of communication among those involved.  This may involve working out details of and preparing to carry out a premeditated crime, or simply arranging to meet up someplace where an unplanned crime would later occur.  Either way, I know from training and experience that cell phones are frequently used for this purpose and that a cell phone recovered from a participant in such criminal activity frequently contains evidence of communication among accomplices.

20.    Based on my training and experience, I know that a cell phone generally contains information which can indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, electronic communications, lists of contacts and calendar entries, social media account information, and images or video recordings – plus data associated with the foregoing, such as date and time – may indicate who used or controlled the device at particular times.  From training and experience, I also know that a cell phone frequently contains images, video recordings, and audio recordings of the cell-phone user and his close associates.  These may

reveal or confirm distinguishing characteristics – such as voice, tattoos, clothing, vehicle, and hangouts – that may help identify them.

21.     Based on my training and experience, I know that victims, witnesses, and perpetrators of crime in Washington, D.C., often communicate between and among themselves before, during, and after the crime.  They communicate using text messaging, apps, social media, photographs, audio and/or video recordings, etc.   In my training and experience, such communications have revealed the identities and relationships between and among the involved individuals, as well as their motive, hostility, knowledge, and intent relating to the crime. Moreover, such communications have also revealed consciousness of guilt and efforts to impede police investigation.

22.     Based on my training and experience, I know that individuals involved in criminal activity use their cell phones to search the internet or social media sites to learn the status of a criminal investigation, i.e., look up the newspaper articles about the crime, determine if the police have suspects, and learn the identity of witnesses.

23.     Based on all of the above, I believe there is probable cause to believe that the Device will likely contain photos, additional messages, chats and conversations documenting the illegal possession, transfer, sale or use of firearms and drugs including, but not limited to the TARGET OFFENSES.  Additionally, the Device will likely provide evidence of persons that HONESTY engaged in these illegal activities prior to his arrest.

## TECHNICAL TERMS

24.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

        a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not

limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

      b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security

software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.f.    "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

   f.  "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form.  It commonly includes programs to run operating systems, applications, and utilities.

   g.  Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.  An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, and sometimes by implication who did not, as well as evidence relating to the commission of the offenses under investigation.

   h.  The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the

Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

       i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

       j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

       k.      A "router" often serves as a wireless Internet access point for a single or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

18

l.      "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.      "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.      "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.  In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at

19

the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

       i.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software.  The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

       ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

       o.     "VPN" means a virtual private network.  A VPN extends a private network across public networks like the Internet.  It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network.  This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two.  The VPN connection across the Internet is technically a wide area network (WAN) link between the sites.  From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network."  The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

       p.     "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it, but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an

encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

       q.     "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

25.    As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found within the Device, in whatever form they are found.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that there is probable cause to believe that the records and information described in Attachment B will be stored in the Device for at least the following reasons:

       a.     It is common for individuals engaged in the unlawful trafficking of firearms to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of firearms, illegal proceeds of such trafficking, and other efforts of co-conspirators.  It is also common for those individuals to utilize social media, such as Instagram, to further their criminal activities;

b.   Individuals engaging in the unlawful trafficking of firearms use cellular telephones, cellular telephone technology, and social media (i.e. - Instagram) to communicate and remain in contact with suppliers, customers, or possessors of those firearms;

c.   Individuals who engage in the unlawful trafficking of firearms use cellular telephones and social media (Instagram) to exchange information with customers and/or sources of supply through text messaging and direct messaging in addition to telephone conversations.  It is also common for firearms traffickers to send photographs and videos as an exchange of information with customers and/or sources of supply;

d.   Individuals who engage in the unlawful trafficking of firearms, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

e.   Cellular telephones and social media accounts used by firearms traffickers contain valuable information and evidence relating to their activities. Such information consists of, but is not limited to: call logs, phone books, photographs, voice mail messages, text messages, direct messages, images and video, Global Positioning System data, and any other stored electronic data.  This information can: (i) reflect the preparation for, arrangement of, and commission of the trafficking; (ii) identify locations where traffickers traveled to before and after transporting or selling contraband; (iii) reflect the ownership and use of the cellular telephones and firearms by the traffickers; (iv) document meetings and communications between traffickers, their customers, associates, and co-conspirators; (v) reflect communications between traffickers and other individuals, discussing the trafficking and possession of firearms; (vi) reflect communications

22

between traffickers and other individuals who may have assisted or provided support in the trafficking or possession of the firearms; (vii) document or contain evidence of the obtaining, secreting, transfer, expenditure and/or the concealment of contraband relating to the trafficking; and (viii) document or contain evidence of the purchase of items from the assets derived from the trafficking of contraband;

f.     Individuals involved in the unlawful trafficking of firearms often use cellphone cameras to take video recordings and photographs of themselves or other members of the organization engaging in illegal activities, such as the brandishing of firearms. Those photographs and videos are often posted on social media accounts such as Instagram, YouTube, or other platforms.

g.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via

23

the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

26.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the Device were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of cellular phones, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device at issue here because:

a.     Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital devices are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.

Digital data stored in the Device, not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       b.     Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      I know that when an individual uses a digital device to traffic firearms, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

27.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms.   Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text

format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

      e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are

often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

    f.  Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

28.  In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

    a.  The Device, and/or any digital images thereof created by law enforcement, sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

    b.  The analysis of the contents of the Device may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to

looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

        c.     In searching the Device, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the Device will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

26.    Because forensic examiners will be conducting their search of the digital device in a law enforcement setting over a potentially prolonged period of time, I respectfully submit that good cause has been shown, and therefore request authority, to conduct the search at any time of the day or night.

## **CONCLUSION**

27.     I submit that this affidavit supports probable cause for a warrant to search the Device

described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

*Thomas R Webb*

Thomas R. Webb
Detective Grade One
D.C. Metropolitan Police Department

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on June 16, 2022

_____

ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

32